1880 COLUMBIA ROAD, N. W., TENANTS' ASSOCIATION, Petitioner,

v.

DISTRICT OF COLUMBIA RENTAL ACCOMMODATIONS COMMISSION et al., Respondents,

Keystone Land Company, Intervenor.

No. 12799.

District of Columbia Court of Appeals.

Argued Dec. 13, 1978.

Decided April 2, 1979.

Richard Halberstein, Washington, D. C., for petitioner.

Michael A. Cain, Asst. Corp. Counsel, Washington, D. C., with whom Louis P. Robbins, Acting Corp. Counsel, and John C. Salyer, III, Asst. Corp. Counsel, Washington, D. C., adopted brief of intervenor, for respondents.

Eric Von Salzen, Washington, D. C., with whom Bonnie S. Temple, Washington, D. C., was on brief, for intervenor.

Before KERN, GALLAGHER and NEBEKER, Associate Judges.

NEBEKER, Associate Judge:

Petitioner seeks reversal of a decision by the D.C. Rental Accommodations Commission (Commission) permitting petitioner's

landlord (hereinafter, owner) to increase rent. Petitioner claims the Commission committed reversible error by including depreciation as an expense in a cash flow computation to determine whether the owner merited a rental increase. If no reversible error is found in such a practice, petitioner claims in the alternative that the Commission erred in failing to limit the depreciation claimed to the amount permitted by the Commission's own regulations. Finally, petitioner argues that the evidence is insufficient to sustain the owner's claimed loss due to vacancy, *i. e.*, "vacancy losses." Finding no reversible error in either the Commission's interpretation of the Rental Accommodations Act permitting depreciation to figure in the cash flow computation, or the Commission's conclusions on both the amount of depreciation allowable and the sufficiency of the evidence establishing a vacancy loss, we affirm.

I

█ On April 28, 1977, the owner (intervenor here) of a 49-unit apartment complex filed a hardship petition with the D.C. Rental Accommodations Office. A hardship petition serves as a request to increase rent and must be justified by a showing of either a negative cash flow or a rate of return of less than eight percent. The instant petition claimed that the owner had suffered a negative cash flow in 1976 notwithstanding the implementation of statutorily permissible increases in rent. An organization calling itself the Georgian Tenants' Association (apparently associated with the 1880 Columbia Road, N.W., Tenants' Association (petitioner)) opposed the rental increase and requested a hearing.[1]

A hearing was granted in which the Hearing Examiner determined that the owner was entitled to a rental increase, not on the basis of a negative cash flow but on the basis of an inadequate rate of return. The inadequate return resulted, in part, from the Examiner's allowance of a depreciation expense in excess of two percent of the assessed market value of the accommodation. The failure of the owner to show a negative cash flow at the hearing was due to the Examiner's disallowance of a depreciation expense deduction in the calculation of cash flow.

Both petitioner and owner appealed the Examiner's decision to the Commission. The owner challenged the disallowance of the depreciation expense. Petitioner contested the sufficiency of the evidence and the accuracy of the calculations supporting the claimed vacancy losses. The Commission ruled that the Examiner had erred in disallowing depreciation and remanded the matter for a recalculation of cash flow. In addition, the Commission upheld the Examiner's decision that the evidence was sufficient to support the claimed vacancy loss. The Commission also determined that no error was made in the Examiner's findings or calculations.

On remand, the Examiner allowed a rental increase[2] finding that the landlord had indeed suffered a negative cash flow for

---

1. At the administrative level the party opposing the rental increase was denominated the Georgian Tenants' Association. The petitioner before this court, however, as the caption reveals, is the 1880 Columbia Road, N.W., Tenants' Association. We, *sua sponte,* directed the parties to file supplemental memoranda addressing the question of whether the present petitioner was the proper party to challenge the rent increase. The parties agree that the present tenants association in fact represents the tenants adversely affected by the rent increase. Accordingly, we do not pursue the matter further in this case.

We do admonish that a difference in nominal identity between parties at the administrative level and those seeking review in this court can raise questions respecting identity of interest, conflict of interest (*see* note 2, *infra*), and exhaustion of administrative remedies. Accordingly, we suggest that it is better practice to maintain party identity but where a change is necessary, effort should be made to seek formal substitution or intervention.

2. Due to financial hardship, six of the tenants were exempted from rental increase by the Hearing Examiner acting pursuant to D.C.Code 1978 Supp., § 45–1649(a). The petitioners have not challenged this ruling though it had the effect of adding to the other tenants' rent payments the share the six would otherwise have had to pay to eliminate the owner's negative cash flow.

1976 once depreciation was included in the cash flow calculation as an expense. Petitioner, having exhausted its administrative remedies, now seeks review of the Commission's decision.

## II

D.C.Code 1978 Supp. § 45–1649 provides two instances in which rent may be increased due to a demonstrated hardship. Subsection (a)[3] permits a rental increase if the landlord can show a negative cash flow after implementing all permissible rent increases under § 45–1644 and after deducting debt service. Upon such a showing, the Rent Administrator may allow a rental increase sufficient to generate a positive cash flow. No formula for calculating cash flow, however, is provided in the statute.

Subsection (b) of § 45–1649 permits an increase in rent, again after including the statutorily available increases, where the rate of return falls below eight percent. The rate of return is to be calculated by using the formula provided in § 45–1644(a)(3)(B).[4] In this formula, deprecia-

tion is specified as one of the expenses to be subtracted from the gross income to determine the rate of return. A two percent straight line depreciation is the maximum amount allowed by the statutory formula "unless and to only the extent [that] any additional amounts are approved by the Rent Administrator." *Id.* at § 45–1644(a)(3)(B)(4). Regulations are formulated by the Commission to govern the allowance of excess depreciation. *See infra.*

On review, petitioner urges this court to hold that different formulas are required to calculate cash flow and rate of return. Petitioner argues that depreciation which is included in the rate of return formula is not a proper expense to include in computing cash flow under § 46–1649. Accounting texts cited by petitioner unquestionably support the proposition that depreciation is not an allowable expense in the computation of cash flow. Petitioner refers to a recent opinion of the Commission in another case to illustrate the failure of the Commission to perceive the generally accepted distinction between cash flow and rate of re-

**3.** This subsection reads as follows:

(a) In those cases where, after any increase which may be permitted by Part (A) of step 3 of subsection (a) of section 45–1644, the landlord can show a negative cash flow after consideration of debt service, the Rent Administrator, upon petition of the landlord, may allow such additional increases in rent as will generate a positive cash flow *Provided* That, in the consideration of such petitions, the Rent Administrator shall consider the degree of hardship which the requested increase will place upon the tenants and the housing accommodations.

**4.** Section 45–1644(a)(3)(B), in full, reads as follows:

(B) In determining the rate of return for each housing accommodation, the following formula shall be used (computed over a base period of any consecutive twelve month period within the fifteen months immediately preceding the filing of the registration statement):

(1) The sum of the maximum possible rent income which can be derived from a housing accommodations shall be added.

(2) To the sum of all other income which can be derived from the housing accommodation.

(3) From the total of maximum possible rental income which can be derived from a housing accommodation plus the sum of all

other income which can be derived from the housing accommodation shall be subtracted (i) the dollar value of vacancy losses and (ii) uncollected rents the remainder of which shall be defined as the "gross income".

(4) From the gross income shall be subtracted (i) the operating expenses; (ii) property taxes; (iii) management fee of no more than six percent of the maximum rental income of the accommodation unless and only to the extent any additional amount is approved by the Rent Administrator pursuant to subsection (b) of section 45–1645; (iv) depreciation expenses (computed on a straight line basis) of no more than two percent of the assessed market value of the housing accommodation may be deducted in any one year as a depreciation expense, unless and to only the extent any additional amounts are approved by the Rent Administrator pursuant to subsection (c) of section 45–1645; and (v) amortized costs of capital improvements if and as permitted pursuant to subsection (a) of section 45–1645. The remainder after such subtractions shall be defined as the "net income".

(5) The net income shall be divided by the assessed market value of the housing accommodation to determine the rate of return.

turn calculations. Petitioner's point is that since a formula for calculating cash flow is not provided by statute, this court should hold that the Commission should follow generally accepted accounting practices.

Petitioner's position on this point is persuasive. It conflicts, however, with the Commission's view that identical formulae should be used in computing both rate of return and cash flow.[5] Our resolution of this issue turns on the reasonableness of the Commission's interpretation of the statute providing for cash flow hardship petitions. *Zenith Radio Corp. v. United States*, 437 U.S. 443, 98 S.Ct. 2441, 57 L.Ed.2d 337 (1978).

As noted above, D.C.Code 1978 Supp., § 45–1649 refers to a formula for calculating rate of return but fails to provide or designate an equation for computing cash flow. In this absence of legislative guidance, the Commission adopted, with an exception not here relevant (*see* note 5, *supra*), the statutory rate of return formula as the formula for calculating cash flow. In so doing, the Commission determined depreciation to be a proper expense in calculating cash flow. Orders by the Commission as early as 1976 evidence this fact. Forms which are printed by the Commission and which set out the formulae for computing rate of return and cash flow include depreciation as an expense in both calculations. In short, the Commission's position has remained constant in allowing depreciation as an expense in computing cash flow.

 Unless shown to be unreasonable, an agency's interpretation of its administered statute will be upheld by courts. *Zenith Radio Corp. v. United States, supra.* Here, petitioner claims that the agency's method of calculating cash flow is incorrect since it differs from general accounting procedures and that this difference causes petitioner to pay increased rents. Treating this argument as a claim that the Commission's interpretation of the statute is unreasonable, we conclude that the claim must fail since we find the Commission's reading of the statute reasonable and justifiable.

By allowing depreciation to be included in cash flow computations, the Commission prevents sporadic and severe fluctuations in rent due to periodic replacement of expensive items. For example, a boiler which has a ten-year expected life may be depreciated over that period of time and a new boiler purchased without seismically altering the amount of tenant's rental payments. Without depreciation allowances, however, rent would skyrocket every ten years to cover the expense of replacing worn out boilers while maintaining a positive cash flow on the rental accommodation. Rents would necessarily plummet the next year to comply with the rent ceiling requirements of the statute. Such an oscillation in rent would inconvenience tenants and most likely frustrate the objectives of the Rental Accommodations statute.

 Though the Commission's procedure of determining cash flow differs from accepted accounting procedures, we find nothing unreasonable in the Commission's decision. While accepted accounting practices are persuasive they are not controlling on agency action which is found to be reasonable in light of the purposes of the statute concerned. Furthermore, nothing in the statute forbids the Commission's adoption of the rate of return formula with its allowance of depreciation for cash flow calculations, nor does the statute endorse the generally accepted accounting method of computing cash flow. We therefore sustain the Commission's decision to permit depreciation to be deducted as an expense in calculating cash flow for the purpose of justifying hardship petitions.

### III

If depreciation is allowed as an expense in cash flow calculations, petitioner argues that the depreciation claimed should be limited to the maximum amount allowable by

---

5. The only difference between the formula used to compute rate of return and that used to calculate cash flow is a deductible expense (debt service) included in the cash flow formula as required by statute. D.C.Code 1978 Supp., § 45–1649(a).

§ 12.20 of the Commission's Regulations (24 D.C.R. 5876, Jan. 13, 1978). This amendment to Regulations § 12.20, which treats petitions for allowance of depreciation in excess of two percent, provides:

> Upon a landlord's petition for depreciation in excess of the 2% allowance under Section 12.10, the Administrator, in calculating the rate of return for a housing accommodation, may grant a depreciation expense equal to the amount of the depreciation claimed by the landlord in the most recently filed federal income tax return, *Provided* that such depreciation is calculated on a straight line basis (or converted thereto for this purpose) and the landlord provides evidence that it was computed in accordance with the useful life guidelines of the Internal Revenue Service, and *Further Provided* that the depreciation so allowed in no event exceeds 20% of the landlord's operating costs, including taxes and management fees but not including depreciation.

Petitioner's position is that the Commission erred in not limiting owner's depreciation expense to the amount specified in this regulation.

In essence we are asked to decide whether regulations adopted by the administrative agency are applicable to cases pending decision in that agency. The publication date of the amendment to § 12.20 was November 7, 1978, two days before the Commission issued its order in the present case. The general rule is that application of agency regulations should be prospective, binding only on actions initiated after the release date of the regulations. *See* K. Davis, Administrative Law Treatise, § 5.08, at 341 (1958); *see also Boston Edison Co. v. F. P. C.,* 181 U.S.App.D.C. 222, 557 F.2d 845, *cert. denied, Towns of Norwood, Concord and Wellesley, Mass. v. Boston Edison Co.,* 434 U.S. 956, 98 S.Ct. 482, 54 L.Ed.2d 314 (1977). In *Boston Edison,* the United States Court of Appeals for the District of Columbia Circuit states:

> Although an administrative agency is not bound to rigid adherence to its precedents, it is equally essential that when it decides to reverse its course, it must give notice that the standard is being changed, . . . and apply the changed standard only to those actions taken by parties after the new standard has been proclaimed as in effect. [*Id.* at 226, 557 F.2d at 849 (citation omitted).]

We endorse this view. To hold that regulations become binding on all actions as of the date of publication would require administrative agencies to reopen for argument actions previously heard but not yet decided. Aside from the financial waste which would result from such a holding, a fundamental unfairness would inevitably result as parties who had previously established their legal positions in reliance upon the former regulations would be forced to justify their positions in light of the new regulations.

We are of the opinion that regulations should be applied prospectively absent a showing (1) that the intention of the Commission was to make the newly released regulations effective retroactively, (2) that such retroactive application is necessary, (3) that the Commission, indeed, has the authority to make regulations retroactively applicable, and (4) that such application of the regulations would not work fundamental unfairness to those concerned. In the instant case, no evidence was introduced indicating that the regulation here involved was meant to apply retroactively. Petitioner's argument, therefore, fails because the instant action had commenced by the date the regulation in question became effective.

## IV

Finally, petitioner challenges the Commission's determination regarding the sufficiency of the evidence introduced to sustain the claimed vacancy losses for 1976. Vacancy losses are defined as "the amount of rent not collected (computed on an annual basis) due to vacant units [which were not] occupied by a landlord or his employees or otherwise not offered for rent." D.C. Code 1978 Supp., § 45–1641(s). These losses are subtracted from gross income in calcu-

lating both rate of return and cash flow using the formula found in § 45–1644.

Petitioner contends that the burden of proof rests upon the owner to prove that the claimed vacancy losses related to the units which had been offered for rent. Petitioner argues that the evidence, consisting of a statement from a newspaper for $29.28 for advertising expenses and a financial statement documenting the amount of losses suffered, is insufficient to support the expenses claimed.

The Commission held that petitioner was precluded from raising this issue since petitioner had failed to raise the issue at the Examiner's hearing. We sustain this determination. *John D. Neumann Properties, Inc. v. D. C. Board of Appeals and Review,* D.C.App., 268 A.2d 605, 606 (1970).

At the hearing, petitioner challenged only the number of vacancies claimed. When it was· found that the vacancies had been overstated, the figures were corrected. Only after the hearing was the issue raised concerning the burden of proof, and then only indirectly in a letter from a representative of petitioner's association to the Hearing Examiner. The owner was never served with a copy of this letter and was, therefore, unable to respond to the questions raised therein.

■ Moreover, assuming, *arguendo,* that the matter was adequately raised at the hearing, we conclude that there was substantial evidence presented to form a basis upon which the Hearing Examiner could have concluded as she did. Once the owner introduced the newspaper advertising bill and the detailed documentation of lost rent through vacancy, his evidentiary burden had been met. The burden then fell upon petitioner to contest the showing. And as noted, petitioner did not attack at the hearing the sufficiency of the vacancy loss evidence. For the reasons stated above, the decision of the D.C. Rental Accommodations Commission is

*Affirmed.*